**In re Anonymous No. 59 D.B. 99**

Disciplinary Board Docket no. 59 D.B. 99.

STEWART, *Member,* October 11, 2000—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

By Supreme Court order of May 4, 1999, [   ], the respondent in these proceedings, was placed on temporary suspension as a result of his conviction for violating

18 U.S.C. §1027 on the basis that he made or caused to be made documents that contained false statements and misrepresentations, documents which were required to be kept as part of records of an employee pension benefit plan by the Employee Retirement Income Security Act of 1974. Petitioner, Office of Disciplinary Counsel, filed a petition for discipline on June 21, 1999, and charged respondent with violation of Pa.R.D.E. 203(b)(1). Respondent filed an answer to petition for discipline on July 19, 1999.

A disciplinary hearing was held on October 7, 1999, before Hearing Committee [    ] comprised of Chair [    ], Esquire, and Members [    ], Esquire, and [    ], Esquire. Respondent was represented by [    ], Esquire. Petitioner was represented by [    ], Esquire.

The Hearing Committee filed a report on February 28, 2000 and recommended a suspension for 24 months retroactive to May 4, 1999, the date of respondent's temporary suspension.

No briefs on exceptions were filed by the parties.

This matter was adjudicated by the Disciplinary Board at the meeting of May 11, 2000.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Common-

wealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was born on September 23, 1949 and was admitted to practice law in the Commonwealth of Pennsylvania on November 17, 1975. Respondent's last registered address was [  ]. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

(3) Respondent became involved in a pension fund fraud and embezzlement scheme initiated by [A], the president, chief executive officer and sole shareholder of [B], doing business as [C], after [A] had taken the funds. [A] was the beneficiary of the scheme, in which he stole pension funds exceeding $550,000 from an employee retirement plan maintained by [C] for the benefit of seven participants. [A] used these funds for his personal benefit and the benefit of his companies. From September 1991 through October 1991, respondent prepared or caused to be prepared documents falsely purporting to convert the retirement plan into an employee stock ownership plan (ESOP) as of the date [A] stole the pension funds, funded by stock of several bankrupt companies owned solely by [A]. These documents concealed the illegal diversion of the assets of the retirement plan. At the time respondent created the documents to assist [A] in carrying out his scheme, he knew that the companies funding the ESOP were in Chapter 11 bankruptcy proceedings.

(4) On March 31, 1997, respondent entered a plea of guilty to one count of an information charging him with violating 18 U.S.C. §1027 on the basis that he made or

caused to be made documents that contained false statements and misrepresentation, documents which were required to be kept as part of records of an employee pension benefit plan by the Employee Retirement Income Security Act of 1974 (ERISA), as amended, Title 29, United States Code, §1001 et seq.

(5) On March 1, 1999, respondent was sentenced by the Honorable [D] to:

(a) probation for a term of five years;

(b) six months home confinement under electronic monitoring;

(c) 100 hours of community service to be performed over a period of two years;

(d) payment of restitution in the amount of $42,500.

(6) Respondent is currently suspended from the practice of law in Pennsylvania by order of the Supreme Court of Pennsylvania dated May 4, 1999, following the submission of a joint petition for immediate suspension by petitioner and respondent.

(7) A violation of 18 U.S.C. §1027 is punishable by imprisonment of up to five years and is a "serious crime," as defined by Pa.R.D.E. 214(i), and respondent's conviction constitutes a per se ground for discipline under Pa.R.D.E. 203(b)(1).

(8) Between March 1991 and July 1991, [A] engaged in a series of transactions that allowed him to withdraw $475,000 of the retirement plan's assets, which he then used for his own personal benefit or to pay his bankrupt companies' operating expenses.

(9) At the time [A] initiated his scheme, the retirement plan had assets totaling approximately $625,000 and

covered seven participants, five of whom were between the ages of 60 and 72.

(10) In August 1991, [A] involved the respondent and another attorney, [E], in his scheme, since he needed their aid in concealing his actions from the retirement plan participants.

(11) Respondent was told that [A] had used the monies he withdrew from the retirement plan to keep the bankrupt companies operating.

(12) [A] told respondent and [E] that two days earlier, he had withdrawn an additional $58,035 from the retirement plan.

(13) Respondent told [A] not to withdraw any more monies from the retirement plan and explained to him that the $58,035 would be treated as a loan that the bankrupt companies had to repay the retirement plan.

(14) Respondent and [E] explained to [A] that by removing the monies from the retirement plan, he had engaged in a prohibited transaction under ERISA; nonetheless, respondent expressed his belief that it might be possible to correct the transaction and convert the retirement plan to an ESOP.

(15) ERISA permits an employer to convert a profit sharing plan to an ESOP so long as there is an independent appraisal prior to the stock sale, there is a stock purchase agreement and there is adequate consideration paid for the stock.

(16) [A] agreed to retain respondent and [E] for the purpose of converting the retirement plan to an ESOP for a fee of $25,000, of which respondent was to receive 40 percent, and [E], 60 percent.

(17) Sometime after the September 11, 1991 meeting, respondent received a facsimile transmission of a document entitled "consent of directors," which purportedly documented [A's] intent to convert the retirement plan to an ESOP prior or contemporaneous to his withdrawal of monies from the retirement plan.

(18) Unbeknownst to respondent, document was back-dated to March 8, 1991 and did not pre-date [A's] withdrawal of monies from the retirement plan in March and July of 1991.

(19) Respondent prepared the following documents prior to an October 14, 1991 meeting:

(a) Employee and stock ownership plan (ESOP plan), which purportedly created the ESOP and which was dated as having been executed on July 25, 1991. This document was backdated and was, in fact, signed on October 14, 1991;

(b) ESOP trust agreement, which purportedly created the trust in which the ESOP's assets were to be held and which was dated as having been executed on July 25, 1991. This document was backdated and was, in fact, signed on October 14, 1991;

(c) Stock purchase agreement, which purportedly transferred, in exchange for $500,000 in retirement plan funds, approximately 12.5 percent of the bankrupt companies' stock to the retirement plan and which was dated as having been executed on March 1, 1991. This document was backdated by respondent and was, in fact, signed on October 14, 1991; and

(d) Promissory note, which was purportedly created to reflect the bankrupt companies' debt to the retirement

plan in the amount of $58,035—which accounted for the withdrawals from the retirement plan in excess of the $500,000 purportedly used to purchase the bankrupt companies' stock, plus interest—and dated as having been executed as of September 8, 1991. This document was backdated and was signed on or about November 1991.

(20) At the October 14, 1991 meeting, prior to [A] signing the promissory note, he informed respondent that he was mistaken in the amount he had withdrawn from the retirement plan just prior to the September 11, 1991 meeting.

(21) Respondent informed [A] that he would revise the promissory note to reflect the correct amount, which, according to [A], was $85,334, and would have him execute it at a later date.

(22) When it came time to sign the ESOP plan and the ESOP trust agreement, respondent told [A] to date the documents October 14, 1991.

(23) [A] insisted that the ESOP plan and the ESOP trust agreement be backdated to March 1991, when he purportedly formed the intent to convert the retirement plan to an ESOP.

(24) Respondent told [A] that the ESOP plan and the ESOP trust agreement should not be backdated.

(25) After some discussion, respondent suggested as a compromise, and [A] agreed, to backdate the ESOP plan and the ESOP trust agreement to July 25, 1991.

(26) Respondent knew, prior to the October 14, 1991 meeting, that ERISA required that the stock purchase agreement, the ESOP plan and the ESOP trust agreement not contain any false or misleading information.

(27) Respondent knew that backdating the ESOP plan and the ESOP trust agreement violated ERISA at the time the documents were executed by [A] and the secretary of the companies, [F].

(28) The backdating of the stock purchase agreement violated ERISA.

(29) The backdating of the promissory note and the stock certificates violated ERISA.

(30) In December 1991, [A] asked respondent and [E] to prepare an opinion letter to the bankruptcy attorney for the bankrupt companies stating that the conversion of the retirement plan into an ESOP was legal and proper.

(31) Respondent agreed to draft such a letter and prepared a draft, which was reviewed, revised and finalized by [E].

(32) On January 2, 1992, [E] sent the opinion letter to the bankruptcy attorney for the bankrupt companies.

(33) That letter, which was submitted to the bankruptcy court, contained misleading statements and omission of material fact in that it stated that the conversion of the retirement plan into an ESOP was legal and proper when the conversion was contingent on securing an independent appraisal which was never obtained.

(34) Respondent, through his actions on behalf of [A] assisted him in concealing his scheme to defraud the plan participants of their assets in the retirement plan by making it appear that the retirement plan had been legally and properly converted to an ESOP.

(35) Sometime in mid-1996, the United States Government notified respondent that he was the target of a criminal investigation.

(36) After retaining counsel, respondent offered to cooperate with the United States Government's criminal investigation.

(37) Respondent's guilty plea and sentence generated negative publicity by the print media.

(38) Respondent's guilty plea and sentence had a negative impact on the public's view of the legal profession.

(39) Respondent has no prior record of discipline.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Pennsylvania Rule of Disciplinary Enforcement:

(1) Respondent's conviction is punishable by up to five years imprisonment and is a serious crime pursuant to Pa.R.D.E. 214(i).

(2) Pursuant to Pa.R.D.E. 203(b)(1), respondent's conviction of a serious crime is an independent ground for discipline.

## IV. DISCUSSION

This matter is before the Disciplinary Board upon a petition for discipline filed as a result of respondent's guilty plea on March 31, 1997, in the United States District Court for the District of [    ] to one count of an information charging him with violating 18 U.S.C. §1027. On March 31, 1999, the district court sentenced respondent to five years probation, six months of home confinement under electronic monitoring, 100 hours of community service, to be performed over two years, and restitution in the amount of $42,500.

Pa.R.D.E. 203(b)(1) provides that conviction of a serious crime shall be grounds for discipline. A serious crime is defined by the rules as a crime punishable by imprisonment of one year or more in this or any other jurisdiction. Rule 214(e), Pa.R.D.E., specifies that a certificate of conviction of an attorney for a serious crime shall be conclusive evidence of that crime. When a disciplinary action is commenced against an attorney based on a criminal conviction, the board does not engage in a retrial of the underlying facts of the crime. The board's responsibility is to determine one appropriate measure of discipline relative to the seriousness of the crime. The focal issue is whether the attorney's character is so damaged by the misconduct as to render him or her unfit to practice law. *Office of Disciplinary Counsel v. Casety,* 511 Pa. 177, 512 A.2d 607 (1986). The issue balances a concern for the public with a respect for the substantial interest of an attorney in maintaining his or her privilege to practice law. *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981). It is appropriate for the board to examine any aggravating or mitigating circumstances present in this matter.

The record reveals that respondent and others became involved in a pension fund fraud and embezzlement scheme initiated by one [A], after [A] had taken the funds. [A] was the beneficiary of the scheme, in which he took pension funds exceeding $550,000 from an employee retirement plan. From August 1991 through January 1992, respondent and others prepared or caused to be prepared documents falsely purporting to convert the retirement plan into an employee stock ownership plan funded by stock of several companies owned solely by [A] as of the date [A] took the pension funds. These docu-

ments concealed the illegal diversion of the assets of the retirement plan.

An examination of reported conviction cases in which the gravamen of the offense involved making false statements reveals that attorneys received discipline ranging from a two-year period of suspension to the most severe sanction of disbarment. *In re Anonymous No. 103 D.B. 89,* 13 D.&C.4th 238 (1991) (two-year suspension); *In re Anonymous No. 16 D.B. 87,* 8 D.&C.4th 493 (1990) (three-year suspension); *Office of Disciplinary Counsel v. Chung,* 548 Pa. 108, 695 A.2d 405 (1997) (five-year suspension); *In re Anonymous No. 18 D.B. 78,* 14 D.&C.3d 759 (1980) (disbarment).

Of the aforementioned cases, the most similar to the instant matter is *No. 16 D.B. 87.* The attorney therein was convicted on two counts of violating 18 U.S.C. §1027 based on his failure to disclose in two annual reports of a pension fund, of which he was the administrator, his private interest in properties for which the pension fund provided mortgages. The mortgages profited the attorney, who was involved in a failing property development venture. The mortgages eventually went into default and the pension fund incurred a loss. At the disciplinary hearing, the attorney presented evidence that he had no prior record of discipline, had regret and remorse over his misconduct, had a good reputation in the community, and engaged in numerous civic and charitable activities. The Supreme Court suspended the attorney for three years. This case is analogous to the instant matter as the attorney engaged in one instance of misconduct as opposed to a pattern of misconduct, which is the hallmark of cases wherein the attorney received a very lengthy suspension or disbarment.

Respondent committed serious misconduct. He had an obligation to uphold the law and instead he acceded to the wishes of a client and backdated documents in violation of the law. From the character testimony presented at the hearing, it is apparent that respondent is a talented attorney. He pushed the limits of creativity into the danger zone in his attempts to help his client.

For the reasons as set forth above, the board recommends a suspension of three years retroactive to May 4, 1999, the date of respondent's temporary suspension.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent [    ], be suspended from the practice of law in the Commonwealth of Pennsylvania for a period of three years retroactive to May 4, 1999.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Elliott dissents and would recommend disbarment.

## ORDER

And now, December 14, 2000, upon consideration of the report and recommendation of the Disciplinary Board dated October 11, 2000, it is hereby ordered that [respondent] be and he is suspended from the bar of this Commonwealth for a period of three years retroactive to May 4, 1999, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Messrs. Justice Zappala and Castille dissent.